IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Wiley Y. Daniel**

Civil Action No.  08-cv-00675-WYD-BNB

ROBERT A. DOLIN; and
LISA DOLIN,

     Plaintiffs,

v.

CONTEMPORARY FINANCIAL SOLUTIONS, INC.; and
MUTUAL SERVICE CORPORATION,

     Defendants.

---

## ORDER

---

THIS MATTER is before the Court on the Motion of Defendants Contemporary

Financial Solutions, Inc. and Mutual Service Corporation to Dismiss Plaintiffs' Complaint

Pursuant to Federal Rule of Civil Procedure 12(b)(6) [doc. #9, filed August 20, 2008].

Defendants move for the dismissal of Plaintiffs' First, Second, Third, Fourth, Fifth,

Tenth, Twelfth, Thirteenth, and Fourteenth claims for relief.  Plaintiffs Robert and Lisa

Dolin filed a response on September 16, 2008 [doc. #16], and Defendants filed a reply

on September 30, 2008 [doc. #26].  Having considered these filings, I enter the

following written Order.

## FACTUAL ALLEGATIONS

This case involves an alleged Ponzi scheme by Robert Olan Bryant, an

employee of Defendant Contemporary Financial Solutions, Inc. ("CFS").  On July 13,

2008, Plaintiffs filed a First Amended Complaint and Jury Demand  ("Complaint") [doc.

#6], in which they allege the following facts. CFS is an alter ego of Co-Defendant Mutual Service Corporation ("MSC") *inter alia* with common business offices, assets, officers, directors, agents, and employees. Complaint at 6. Alternatively, CFS is MSC's agent, and accordingly MSC is liable for CFS's acts and omissions. *Id.* at 7. CFS employed Bryant, a licensed securities broker, from February 2003 to December 31, 2004 as its registered representative with an office in Colorado. Complaint at 2. Among the investment products that Bryant sold to his clients, including Plaintiffs Robert and Lisa Dolin, were promissory note contracts offered by National Consumer Mortgage, LLC ("NCM"), a California mortgage brokerage firm. *Id.* Beginning in October 2003, Bryant represented to Plaintiffs that NCM's Private Money Division made "private money" or "hard money" loans ("HMLs") in large amounts at higher-than-market interest rates and for terms shorter than traditional mortgages. *Id.* at 3.

Bryant represented to Plaintiffs that each of the HMLs was "secured by a first-position mortgage or deed of trust encumbering choice or high quality real estate, with all such transactions having a strong equity to loan ratio." *Id.* He further represented to them that NCM's "private money investment" program depended on cash advances or investments to fund specific HMLs in exchange for the good rate of return over a relatively short period of time, and with little risk of loss. *Id.* He represented to them that each of these investments was documented with a written Note Contract on NCM-generated forms. *Id.* Bryant further represented to Plaintiffs that they could receive referral fees. *Id.* at 4. He also told them about the success and trustworthiness of the program, which he said had been in operation since 1992, and he said that the Note

Contracts were safe, secure, and legal. *Id.* Sam Favata, Bryant's close friend who was represented to be in charge of NCM's Private Money Division, and his wife Sandra Favata, who was represented to be in charge of NCM's traditional mortgage brokerage division, made similar representations. *Id.* at 2-5 & n.2. Plaintiffs ultimately invested in NCM's "private money investment" program:

> In 2003 Bryant solicited the Dolins to "invest" in the [p]rogram through him, as a registered representative of CFS in Colorado, expressly then disclosing to them his licensed status and relationship with CFS. In approximately March of 2004 they first invested in the [p]rogram in reliance on Bryant's representations about himself, such licensed status, the CFS connection, and [ ] Bryant['s] [r]epresentations concerning NCM and the [p]rogram. They renewed that investment in the [p]rogram, again relying on those same factors, in the Fall of 2004 and then in 2005 as well.

*Id.* at 6.

In early August of 2004, the Arkansas Securities Department ("ASD") notified CFS that it was investigating Bryant for violating securities laws by selling, and soliciting for the sale of, the Note Contracts. *Id.* Various federal and state statutes and/or regulations required each Note Contract to be registered with the appropriate state and/or federal securities agencies, and such registration never occurred. *Id.* at 5. The ASD further "asked Defendants to investigate Bryant's sale of NCM Note Contracts, furnish the ASD with the names and addresses of all persons who had purchased such Note Contracts, and give the ASD its assurance that Bryant, as Defendants' representative, would no longer sell them." *Id.* at 6. On August 19, 2004, MSC's Vice President and General Counsel responded to the ASD that they were investigating the report, and in October 2004 Defendants told the ASD that their thorough investigation had revealed that Bryant was not selling Note Contracts. *Id.* at 7.

The representations were false because Bryant had already sold approximately $2,450,000 in Note Contracts as of August 2004. *Id.* MSC's investigation had been limited to contacting Bryant and relying on his denial that he was selling or soliciting Note Contracts. *Id.* Neither CFS nor MSC performed any review of Bryant's financial accounts, contacted his customers, or conducted any investigation of the legality of the Note Contracts. *Id.* "Defendants thus knew or should have known no later than September of 2004 that Bryant was illegally selling Note Contracts." *Id.* at 8. Defendants' false representations "caused the ASD to refrain from actively pursuing its investigation of Bryant, who then continued to sell Note Contracts in 2004, 2005, and 2006." *Id.*

On "December 17, 2004, Defendants gave Bryant the option of 'resigning, or being involuntarily terminated', and Bryant's employment relationship with Defendants ended on December 31, 2004." *Id.* Defendants then filed a Form U-5 with the National Association of Securities Dealers and various state security regulatory agencies, including those in Colorado and Arkansas, stating that Bryant's departure was voluntary. *Id.* The Form U-5 omitted any information regarding the Note Contracts and stated that Bryant was not the subject of investigation by any governmental body or any self-regulatory agency and was not under internal review for violating investment-related statutes, regulations, rules, or industry standards of conduct. *Id.* at 8-9. Defendants falsely notified the ASD in May 2005 that Bryant had voluntarily terminated his employment and that they believed he had not sold any NCM notes. *Id.* at 9. "When the ASD learned the true facts in November of 2006, it immediately issued a Cease and

Desist Order against Bryant and NCM to stop selling Note Contracts." *Id.* Had Defendants taken the proper and timely course of action in their supervision and investigation of Bryant and reports to state and federal regulatory authorities, those authorities would have taken the necessary action to prohibit Bryant from selling Note Contracts. *Id.* Instead, during 2004, while he was a registered representative of Defendants, Bryant sold over $3,000,000 in NCM notes, and he sold more than $10,000,000 in additional Note Contracts in 2005 and 2006. *Id.*

Neither CFS nor MSC ever disclosed to Plaintiffs or any other actual or potential customers of Bryant that he was ever under investigation by securities regulators. *Id.* at 9. Plaintiffs, at the time of their Note Contract purchases and/or renewals in 2004 and 2005, had no knowledge that there was anything improper or irregular about Bryant's conduct or the Note Contracts, nor did they have any knowledge of any of the circumstances surrounding the ASD's investigation of Bryant. *Id.* at 10.

NCM filed for bankruptcy in April 2006, and afterward it was revealed that the "private money investment" program was in fact a Ponzi scheme. *Id.* at 10. No HMLs had actually been made, and the Note Contracts were not secured by real estate or any hard assets. *Id.* Instead, the scheme perpetrators, including Bryant and Sam and Sandra Favata, used the bulk of the invested funds for their own personal benefit while using some funds from new investors to pay amounts facially due to earlier investors "under illicitly crafted investment contract schedules." *Id.* at 10 n.4. Bryant pleaded guilty to securities fraud and has been incarcerated for a term of years. *Id.* at 10. He has filed a Chapter 7 Bankruptcy action in the United States Bankruptcy Court for the

District of Colorado and is the subject of an Adversary Action by Plaintiffs under 11

U.S.C. § 523(a) to prevent discharge of Bryant's debts to them.  *Id.* at 10-11.  Sam

Favata has also been incarcerated for a term of years after pleading guilty to mail fraud

in a federal district court in California.  *Id.* at 11.

> Plaintiffs have incurred the following harm:
>
> [Plaintiffs] have lost funds they so "invested" in the Note Contracts and have incurred additional financial losses and debts, as well as non-economic damages (e.g., emotional distress, humiliation, loss of reputation, embarrassment, inconvenience and loss of quality of life), as a result of having been induced to participate in the Program/ Ponzi Scheme, and in consequence of their purchase and/or renewal of Note Contracts thereunder.

*Id.* at 10.  They assert the following claims against Defendants: 1) negligent hiring; 2)

negligent supervision; 3) negligent failure to monitor, investigate, and report; 4)

negligence *per se*; 5) direct and vicarious liability for Bryant's sale of unregistered

securities; 6) vicarious liability for Bryant's fraudulent misrepresentations; 7) vicarious

liability for Bryant's fraudulent concealment; 8) vicarious liability for Bryant's negligent

misrepresentations; 9) direct and vicarious liability for Bryant's securities fraud under the

Colorado Securities Act; 10) direct and vicarious liability for Bryant's violations of

Section 12(2) of the 1933 Securities Act; 11) direct and vicarious liability for Bryant's

violations of Rule 10b-5; 12) vicarious liability for Bryant's violations of the Colorado

Organized Crime Control Act; 13) vicarious liability for outrageous conduct; and 14)

vicarious liability for Bryant's violations of the Colorado Consumer Protection Act.  *Id.* at

11-35.

**ANALYSIS**

Defendants' arguments in support of dismissal center around their relationship with Plaintiffs during the time that Bryant committed the alleged fraud. In their response, Plaintiffs have stated that they seek dismissal of any and all negligence *per se* claims for relief predicated on violations of the Securities Act of 1933 and the Securities and Exchange Act of 1934. Response at 10-11. They have also stated that they seek dismissal of their fifth and tenth claims for relief regarding violations of the 1933 Securities Act. *Id.* at 11. Accordingly, these claims will be dismissed.

Judge Nottingham of this Court previously heard a case involving the Ponzi scheme at hand. *See Prymak v. Contemporary Financial Solutions, Inc.*, No. 07-cv-00103-EWN-KLM, 2007 WL 4250020 (D. Colo. Nov. 29, 2007). Much of the argument surrounding the present Motion involves the propriety of Judge Nottingham's rulings and the analogousness of Plaintiffs' situation to that of the plaintiffs in *Prymak.*

**A. Legal Standard**

When considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court "assume[s] the truth of the plaintiff's well-pleaded factual allegations and view[s] them in the light most favorable to the plaintiff." *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007). A complaint survives a motion to dismiss when it "contains 'enough facts to state a claim to relief that is plausible, [not merely conceivable,] on its face.'" *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1969 (2007)). "Thus, the mere metaphysical possibility that *some* plaintiff could prove *some* set of facts in support of the pleaded claims is

insufficient; the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims." *Id.*

## B. First, Second, and Third Claims for Negligence

To establish a prima facie case of negligence, a plaintiff must demonstrate the following elements: "(1) the existence of a legal duty to the plaintiff; (2) the defendant breached that duty; (3) the plaintiff was injured; and (4) the defendant's breach of duty caused the injury." *Raleigh v. Performance Plumbing and Heating, Inc.*, 130 P.3d 1011, 1015 (Colo. 2006). Defendants argue that Plaintiffs' first three negligence-based claims - for negligent hiring, negligent supervision, and negligent failure to monitor, investigate, and report - should all be dismissed because of the absence of the first element. They argue that they owed no duty of care to Plaintiffs, who were "strangers" because they did not have any accounts with CFS. Plaintiffs respond, "Whether or not the Dolins had a formal account with CFS or MSC, they were customers of its registered representative (and therefore of his principal) in Colorado for investment products and financial advisory and planning services." Response at 3-4. I agree with Plaintiffs, as Defendants' argument is unavailing in light of relevant case law.

With regard to the duty of care owed in the context of negligent hiring, the Colorado Supreme Court has observed:

> [F]oreseeability of harm to the plaintiff is a prime factor in the duty analysis. A court should also weigh other factors, including the social utility of the defendant's conduct, the magnitude of the burden of guarding against the harm caused to the plaintiff, the practical consequences of placing such a burden on the defendant, and any additional elements disclosed by the particular circumstances of the case. No one factor is controlling; the question whether a duty should be imposed in a particular case is essentially one of fairness under contemporary standards -

> whether reasonable persons would recognize a duty and agree that it
> exists.

*Id.* at 1016 (citing *Connes v. Molalla Transp. Sys., Inc.*, 831 P.2d 1316, 1321 (Colo. 1992)).  These factors are nearly identical to the five factors both parties cite from *Solano v. Goff*, 985 P.2d 53 (Colo. App. 1999), in relation to whether a defendant owes a legal duty to prevent a third person from harming another.  *See id.* at 54.  The only difference is that the first factor in the *Solano* analysis is the existence of a special relationship between the parties.  *Id.*

In *Prymak*, the case involving the same Ponzi scheme as in the present case, Judge Nottingham found that a special relationship between the defendants and plaintiffs did exist, in the form of a fiduciary relationship.  2007 WL 4250020 at *13.  He first found a fiduciary relationship between the plaintiffs and Bryant "because he had practical control over their accounts and acted as their investment advisor."  *Id.*  He then found that "a fiduciary relationship, once established between a broker and a client, necessarily extends to the broker-dealer."  *Id.*  Judge Nottingham made this finding even though the plaintiffs in that case incurred the alleged harm after Bryant's employment with CFS had ended.  *See id.* at *12.  Contrary to Defendants' attempt to distinguish *Prymak* from the present case, there is no suggestion that Judge Nottingham's finding depended in any part on those plaintiffs' ownership of CFS accounts.  Like in *Prymak*, in the present case, Plaintiffs' allegations support a finding that Bryant had control over their accounts and thus owed them a fiduciary duty.  I find that this duty extends to Defendants and that a special relationship thus existed between the parties in the present case.

Furthermore, in *Raleigh*, the Colorado Supreme Court cited the Restatement of Agency in finding, "Liability results . . . not because of the relation of the parties, but because the *employer antecedently has reason to believe that an undue risk of harm would exist because of the employment*." 130 P.3d at 1017 (emphasis in original) (citing Restatement (Second) of Agency § 213 cmt. d (1958)). The court proceeded by citing its previous holdings in various negligence-based contexts that "the scope of the employer's duty in exercising reasonable care in a hiring decision depends on the employee's anticipated degree of contact with other persons in carrying out the job for which the employee was hired." *Id.*; *see also id.* at 1018-19. The court also noted that "the vast majority of negligent hiring cases involve intentional torts committed by an employee who is not acting within the scope of his or her employment." *Id.* at 1016 n.6. Finally, the court also mentioned that employers incur responsibilities to not only customers but also business invitees. *Id.* at 1017.

Thus, the duty of care is not nearly as limited as Defendants suggest, and I find with regard to the present case that Defendants owed a duty of care to Plaintiffs. Unlike the case in which an employee-plumber causes an automobile accident on his way home from work, *see id.* at 1019, or where a commercial vehicle driver sexually assaults a woman while on a cross-country commercial trip, *see Connes*, 831 P.2d at 1321-23, in the present case Defendants' alleged actions directly created the risk of the harm Bryant caused to Plaintiffs. CFS employed Bryant as a securities broker and its registered representative, and Bryant came into contact with Plaintiffs because of his capacity as a broker. *See Prymak*, 2007 WL 4250020 at *17 ("The association between

Mr. Bryant and client-Plaintiffs was occasioned by his job as a representative of Defendants. By allowing Mr. Bryant to act as a registered representative, Defendants essentially sanctioned Mr. Bryant's relationship with client-Plaintiffs as a securities dealer."). Again, in *Prymak*, Judge Nottingham found a duty of care even though the plaintiffs in that case incurred the alleged harm after Bryant's employment with CFS ended. *Id.* at *17-18. Also, in the present case Plaintiffs allege that Bryant's relationship with CFS factored into their decision to invest through him. I find that this analysis applies to the context of not only negligent hiring, but also negligent supervision and negligent failure to monitor, investigate, and report. Defendants make no specific arguments with regard to the other contexts but rather only ineffectively argue that they owed no duty of care. Accordingly, whether under the analysis of a special relationship or the scope of employment, I find that Defendants owed a duty of care to Plaintiffs and that Plaintiffs' first, second, and third negligence claims survive dismissal.

## C. Fourth Claim for Negligence *Per Se*

"Negligence *per se* is simply negligence with the standard of care being set forth in a statute or ordinance." *Neiberger v. Hawkins*, 208 F.R.D. 301, 309 (D. Colo. 2002) (citing *Largo Corp. v. Crespin*, 727 P.2d 1098, 1107 (Colo. 1986)); *see also Wallman v. Kelley*, 976 P.2d 330, 333 (Colo. App. 1998). "Before the statutory standard is used to prove negligence, the plaintiff must show that he is a member of the class the statute was intended to protect, and that the injuries he suffered were of the kind the statute was enacted to prevent." *Largo*, 727 P.2d at 1108. "The party seeking to recover under the doctrine of negligence per se must show not only that the defendant violated the

statutory standard, but also that the violation was the proximate cause of the injuries sustained." *Id.* at 1107.

Plaintiffs contend that Defendants' false, misleading, and/or inadequately investigated response to ASD's investigation, as well as their filing of the false and misleading Form U-5 after the end of Bryant's employment, violated various state statutes and regulations, including Colorado and Arkansas securities laws. *See* Colo. Rev. Stat. § 11-51-502; Ark. Code. Ann. §§ 23-42-110, 23-42-205. As noted above, Plaintiffs have conceded their negligence *per se* claims predicated on federal statutes. In *Prymak*, Judge Nottingham found that the plaintiffs in that case had no private right of action under either Colo. Rev. Stat. § 11-51-502 or the Arkansas Securities Act. 2007 WL 4250020 at *6-8. In the present case, Plaintiffs do not claim direct recovery under those provisions, and Defendants argue that their inability to recover directly under the statutes bars their negligence *per se* claims.

There is a split in authority as to whether negligence *per se* claims survive where the relied-upon statutes bar private rights of action, but I ultimately find that Plaintiffs' negligence *per se* claims do survive dismissal even if they do not have private rights of action under the statutes. In *Prymak*, Judge Nottingham held, "The doctrine of negligence *per se* may provide a plaintiff with a cause of action in negligence that he could not have sustained under the violated statute itself." 2007 WL 4250020 at *10. He reasoned that violations of criminal, regulatory, and safety statutes may constitute negligence *per se*, even though an individual generally has no private right of action under those statutes. *Id.* (citing *Largo*, 727 P.2d at 1108; *Bittle v. Brunetti*, 750 P.2d 49,

55 (Colo. 1988); *Schneider v. Midtown Motor Co.*, 854 P.2d 1322, 1326 (Colo. Ct. App. 1992); *Hageman v. TSI, Inc.*, 786 P.2d 452, 454 (Colo. Ct. App. 1989)).  Accordingly, he concluded that his finding with regard to the plaintiffs' right of action was not determinative of their negligence *per se* claim.  *Id.*

I agree with Judge Nottingham's ruling in *Prymak*, as I find it to have stronger reasoning than the authority to the contrary.  In addition to the authority relied upon in *Prymak*, I note that the Colorado Supreme Court has provided, "A statutory cause of action is independent of common-law principles and may, in fact, be inconsistent with those principles. . . . In contrast to a statutory cause of action, the doctrine of negligence per se is part of the common law, created by the courts."  *Largo*, 727 P.2d at 1108. Accordingly, legal remedies provided by statutes should have no bearing on the common-law remedy of negligence *per se*.

Furthermore, I am not persuaded by the authority suggesting that negligence *per se* claims should be barred where a statute provides no private right of action.  First, in *Neiberger*, Judge Babcock provided no authority for his finding that "[p]laintiffs may not receive through a negligence *per se* claim what they could not receive by bringing a direct claim under the statute."  *Neiberger*, 208 F.R.D. at 309.  Also, one Tenth Circuit case has held that where regulations already provide a scheme for enforcement and therefore do not support a private right of action, negligence *per se* claims should not be permitted.  *FDIC v. Schuchman*, 235 F.3d 1217, 1225-26 (10th Cir. 2000).  I find that case to be inapposite because it relied upon New Mexico law, *see id.* at 1224-25, and in the present case there is language from the Colorado Supreme Court supporting the

opposite proposition. Accordingly, I find that even if Plaintiffs are not entitled to private rights of action under either Colo. Rev. Stat. § 11-51-502 or the Arkansas Securities Act, they can still bring negligence *per se* claims based on the standards set forth in these statutes.

I further follow Judge Nottingham's reasoning in *Prymak* in finding that "Plaintiffs' allegations easily support a finding that they are members of the class the Colorado and Arkansas securities acts were intended to protect and that they suffered the kind of injuries the Acts were enacted to prevent." 2007 WL 4250020 at *9. He reasoned:

> The Colorado Securities Act itself provides that its purposes are to *protect investors* and maintain public confidence in securities markets while avoiding unreasonable burdens on participants in capital markets. Moreover, the Act is remedial in nature and is broadly construed to effectuate its purposes. Similarly, the Arkansas Securities Act was passed primarily for the purpose of protecting members of the public who might invest in offerings by promoters of securities. Further, the Act is remedial in nature and is to be liberally construed to afford protection to the investing public. It is clear to this court that the reporting provisions of the Colorado and Arkansas securities acts are intended to protect the investing public from the perpetration of fraudulent securities schemes such as the one alleged in the instant case.

*Id.* (quotations and citations omitted). Accordingly, I find that Plaintiff's claim for negligence *per se* pursuant to state laws and regulations survives dismissal.

**D. Twelfth Claim for Liability Under Colorado Organized Crime Control Act**

Plaintiffs allege that Defendants are vicariously liable for Bryant's violations of the Colorado Organized Crime Control Act (COCCA), specifically Colo. Rev. Stat. sections 18-17-103(1) through (4), under the alternative theories of actual or apparent authority and/or respondeat superior. Complaint at 31. Defendants' sole argument in support of dismissal of this claim is that COCCA does not allow for vicarious liability. They cite

case law that they claim supports the proposition that the Federal Racketeer Influenced and Corrupt Organizations Act (RICO), on which COCCA was modeled, does not provide for secondary or vicarious liability. *See* Motion at 11-12 (citing, *inter alia*, *Reves v. Ernst & Young*, 507 U.S. 170, 178-79, 185 (1993)).

"Because COCCA was modeled after [RICO], federal cases interpreting RICO, while not dispositive, are instructive upon similar issues under COCCA." *New Crawford Valley, Ltd. v. Benedict*, 877 P.2d 1363, 1370 (Colo. App. 1993). There have been cases where Colorado courts have declined to follow the federal precedent interpreting RICO. *See People v. Chaussee*, 880 P.2d 749, 757-58 (Colo. 1994) (declining to follow federal RICO precedent with regard to definition of "pattern of racketeering activity" because of difference in COCCA's language). The provision presently in dispute does contain distinctions when compared to the parallel RICO provision. *Compare* Colo. Rev. Stat. § 18-17-104(3) ("It is unlawful for any person employed by, or associated with, any enterprise to *knowingly* conduct or participate, directly or indirectly, in *such enterprise* through a pattern of racketeering activity or the collection of an unlawful debt.") (emphasis added); *with* 18 U.S.C. § 1962(c) ("It shall be unlawful for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in *the conduct of such enterprise's affairs* through a pattern of racketeering activity or collection of unlawful debt."). At least one state court has relied on this difference to find a distinction between its corruption law and RICO. *Cf. People v. Martin*, 721 N.W.2d 815, 843-44 (Mich. Ct. App. 2006) (relying on the distinction in required participation to distinguish *Reves* and find that the "prosecution was not

required to demonstrate that defendant held a position of authority within the enterprise, but only that he conducted or participated in its affairs through a pattern of racketeering activity") (citing *Reves*, 507 U.S. at 177-79).

Nonetheless, contrary to Defendants' contention, the authority interpreting RICO does not bar vicarious liability under that Act. First, *Reves* did not address *respondeat superior.* The *Reves* Court held that in order to be held liable under 18 U.S.C. §1962(c), "one must participate in the operation or management of the enterprise itself." *Reves*, 507 U.S. at 185. *Reves* concerned the involvement of an accounting firm. *See id.* at 174-75. In a decision coming eight years later, the Supreme Court stated that whether "ordinary *respondeat superior* principles make a corporation legally liable under RICO for the criminal acts of its employees . . . is a matter of congressional intent not before us." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 165 (2001). In the case from this District that is the center of the dispute between the parties on this issue, Judge Babcock declined to follow *Reves* in finding that COCCA allowed for aiding and abetting liability. *See FDIC v. First Interstate Bank of Denver, N.A.*, 937 F. Supp. 1461, 1471 (D. Colo. 1996). He actually cited *Reves* in support of the proposition that COCCA allows for *respondeat superior*, though with no reasoning, or even a pin cite. *Id.* (citing "*Central Bank and Reves*"). Nonetheless, I find that *Reves* has no bearing on whether COCCA allows for *respondeat superior*.

*Respondeat superior* under RICO has been a point of disagreement among various circuits. The Sixth Circuit reconciled the various holdings by finding that RICO does not provide for vicarious liability when the corporation is the same as the alleged

enterprise, but that vicarious liability can be imposed when the corporation is a "person" distinct from the alleged enterprise, particularly where the corporation benefits from the enterprise run by its agents. *Davis v. Mut. Life Ins. Co.*, 6 F.3d 367, 378-79 (6th Cir. 1993) (citing *Miranda v. Ponce Fed. Bank*, 948 F.2d 41, 45 (1st. Cir. 1991) (holding of no *respondeat superior* is limited to where corporate defendant and enterprise are indistinguishable); *Luthi v. Tonka Corp.*, 815 F.2d 1229, 1230 (8th Cir. 1987) (no vicarious liability "particularly where the pleadings indicate that the principal was a victim of the individual's activities"); *D & S Auto Parts, Inc. v. Schwartz*, 838 F.2d 964, 966-68 (7th Cir. 1988) (holding of no *respondeat superior* is limited to a corporation indistinguishable from the alleged RICO enterprise that neither benefitted from nor participated in the criminal scheme.); *Brady v. Dairy Fresh Prods. Co.*, 974 F.2d 1149, 1154 (9th Cir. 1992) (refusing to impose vicarious liability where corporation was indistinguishable from the alleged enterprise or if company was not benefitted by acts of the individual defendant); *Petro-Tech, Inc. v. Western Co. of N. Am.*, 824 F.2d 1349, 1361-62 (3d Cir. 1987) (vicarious liability is appropriate where corporation is distinct from RICO enterprise and "is alleged to have attempted to benefit from its employees' racketeering activity")); *accord Miller v. Yokohama Tire Corp.*, 538 F.3d 616, 619-20 (9th Cir. 2004); *Gas Sales, Inc. v. Aero Oil Co.*, 39 F.3d 70, 73 (3d Cir. 1994); *Laro, Inc. v. Chase Manhattan Bank*, 866 F. Supp. 132, 140 (S.D.N.Y. 1994) (no vicarious liability where corporation was neither "central figure" nor beneficiary of alleged fraud). In the present case, the alleged enterprise is the Ponzi scheme, which is distinct from both Defendants. Accordingly, federal precedent provides some suggestion that RICO would

allow for vicarious liability under the *respondeat superior* theory in the present case.

There may also be a remaining issue of whether Defendants benefitted from the Ponzi scheme, but I find that this issue does not provide grounds for dismissal for two reasons. First, Defendants have not raised this argument, and second, a determination of whether Defendants benefitted from the Ponzi scheme appears to require additional facts, rendering dismissal inappropriate at this stage. I also note that the cases cited by Defendants specifically address the RICO provision corresponding with Colo. Rev. Stat. § 18-17-104(3), and accordingly Defendants have not addressed Plaintiffs' allegations of violations of the other COCCA provisions. The case they cite from this District finds that under section 18-17-104(1)(a), "liability . . . attaches only where the defendant has knowingly received proceeds derived from racketeering; there is no such thing as negligent violation of COCCA." *Sender v. Mann*, 423 F. Supp. 2d 1155, 1177 (D. Colo. 2006). This proposition does not extend to a finding of no vicarious liability under that section or the other sections, particularly where this proposition comes from Judge Babcock, who had previously decided that section 18-17-104(3) does allow for vicarious liability. *See FDIC*, 937 F. Supp. at 1471. More importantly, Defendants have not challenged either of the agency theories under which Plaintiffs allege Defendants' liability in the Complaint. *See, e.g.*, *Grease Monkey Int'l, Inc. v. Montoya*, 904 P.2d 468, 473 (Colo. 1995) (agency principles are not based upon the rules of *respondeat superior*). Accordingly, I find that Plaintiffs' COCCA claim survives dismissal.

**E. Fourteenth Claim for Liability Under Colorado Consumer Protection Act**

Similar to their COCCA claim, Plaintiffs allege that Defendants are vicariously

liable for Bryant's violations of the Colorado Consumer Protection Act (CCPA), under

the alternative theories of actual or apparent authority and/or respondeat superior.

Complaint at 35. Again, Defendants' sole argument in support of dismissal of this claim

is that the CCPA does not allow for vicarious liability. Neither side has cited any

authority directly on point, and the language of the statute is the sole basis for the

argument between the parties on this issue. The CCPA provides for civil liability

"against any person who has engaged in or caused another to engage in any deceptive

trade practice . . . ." Colo. Rev. Stat. § 6-1-113(1). The CCPA further defines "person"

to include a corporation. § 6-1-102(7). The Colorado Supreme Court has held:

> To prove a private claim for relief under the CCPA, a plaintiff must show:
> (1) that the defendant engaged in an unfair or deceptive trade practice; (2)
> that the challenged practice occurred in the course of defendant's
> business, vocation, or occupation; (3) that it significantly impacts the
> public as actual or potential consumers of the defendant's goods, services,
> or property; (4) that the plaintiff suffered injury in fact to a legally protected
> interest; and (5) that the challenged practice caused the plaintiff's injury.

*Crowe v. Tull*, 126 P.3d 196, 201 (Colo. 2006) (internal quotation omitted). Defendants

argue that because the language of the statute requires action on the part of the liable

party, the CCPA does not allow for vicarious liability, which is liability without fault.

Plaintiffs argue that because corporations can only act through agents or servants, the

CCPA's definition of "person" inherently indicates that it provides for vicarious liability. I

ultimately agree with Plaintiffs in finding that the CCPA does provide for vicarious

liability.

"Colorado courts have taken an expansive approach to interpreting the CCPA."

*City of Aspen v. Kinder Morgan, Inc.*, 143 P.3d 1076, 1080 (Colo. App. 2006). For

example, the Colorado Supreme Court has held that "in determining whether conduct falls within the purview of the CCPA, it should ordinarily be assumed that the CCPA applies to the conduct. That assumption is appropriate because of the strong and sweeping remedial purposes of the CCPA." *Showpiece Homes Corp. v. Assurance Co. of Am.*, 38 P.3d 47, 53 (Colo. 2001). It has also held, "In order to effectuate the broad remedial relief and deterrence purposes, the CCPA does not require proof of actual injury." *May Dep't Stores Co. v. State ex rel. Woodward*, 863 P.2d 967, 973 (Colo. 1993).

The courts' broad reading of the CCPA lends support to a finding that it allows for vicarious liability. In *FDIC*, Judge Babcock relied on the broad purpose of COCCA in finding it allows for secondary liability, both in the forms of "aiding and abetting" liability and *respondeat superior*. *See* 937 F. Supp. at 1470-71. Furthermore, the proposition that corporations can act only through their agents supports a finding that they should be held liable when their agents violate the CCPA. *See Dallas Creek Water Co. v. Huey*, 933 P.2d 27, 41 (Colo. 1997). Finally, while my research has revealed no cases directly on point, there is some helpful authority from the Washington state court. *See Showpiece Homes*, 38 P.3d at 54 ("In the past we have specifically looked to Washington law because Washington state law has long served as a model for the development of consumer protection legislation." (internal quotation omitted)). In *Stephens v. Omni Ins. Co.*, 159 P.3d 10 (Wash. Ct. App. 2007), the court ultimately found that the facts of the case at hand did not support vicarious liability, but its ruling was based on a finding of a lack of a right to control, not on a finding that the

Washington Consumer Protection Act in no instance would allow for vicarious liability. *Id.* at 27. While the Washington Act does not contain the same language as is presently at issue, *see* Wash. Rev. Code. Ann. §§ 19.86.010-920, the elements required for recovery are nearly identical. *See Stephens*, 159 P.3d at 18 ("(1) unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) public interest impact; (4) injury to plaintiff in his or her business or property; (5) causation"). Because of this authority suggesting the possibility of vicarious liability under the CCPA, along with the CCPA's broad scope and its direct application to corporations, I find that it allows for vicarious liability and that Plaintiffs' claim under the CCPA accordingly survives dismissal.

## F. Thirteenth Claim for Outrageous Conduct

In order to recover for the tort of extreme and outrageous conduct, a plaintiff must prove three elements: (1) the defendant engaged in extreme and outrageous conduct; (2) the defendant engaged in the conduct recklessly or with the intent of causing the plaintiff severe emotional distress; and (3) the plaintiff incurred severe emotional distress which was caused by the defendant's conduct. *Culpepper v. Pearl St. Bldg., Inc.*, 877 P.2d 877, 882 (Colo.1994). "Although the question of whether conduct is outrageous is generally one of fact to be determined by a jury, it is first the responsibility of a court to determine whether reasonable persons could differ on the question." *Coors Brewing Co. v. Floyd*, 978 P.2d 663, 666 (Colo. 1999) (quoting *Culpepper*, 877 P.2d at 883). "Outrageous conduct" is defined as conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized

community." *E.g.*, *Coors*, 978 P.2d at 666. "Proof of the tort of outrageous conduct must consist of either an extreme act, both in character and degree, or a pattern of conduct from which the ineluctable conclusion is the infliction of several mental suffering was calculated or recklessly and calculously inflicted." *Gard v. Teletronics Pacing Sys., Inc.*, F. Supp. 1349, 1354 (D. Colo. 1994). Language from the Restatement of Torts emphasizes the limited nature of this tort: "It has not been enough that the defendant acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort." Restatement (Second) of Torts § 46 cmt. d.

Plaintiffs' allegations do not support a finding of outrageous conduct in the present case. Notwithstanding Bryant's conduct, a reasonable person could not find that the conduct of Defendants rose to the extreme level of going "beyond all possible bounds of decency, and [being] regarded as atrocious, and utterly intolerable in a civilized community." *Coors*, 978 P.2d at 666. Plaintiffs have provided no authority supporting a finding that Defendants' conduct rises to that level, and the cases they cite are inapposite. In *Prymak*, Judge Nottingham noted, "Plaintiffs have pointed to no cases finding outrageous conduct in [a] broker-dealer's failure to report or stop misconduct leading to financial losses, and this court's research has revealed none." 2007 WL 4250020 at *20. Plaintiffs only cite one case from the Tenth Circuit in which a broker's conduct has led to a finding of outrageous conduct. *See Malandris v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 703 F.2d 1152 (10th Cir. 1981). That case is

inapposite for two reasons.  First, the Tenth Circuit in *Malandris* relied in part on the plaintiff's diagnosis of "depressive neurosis" as a result of her losses stemming from transactions with defendant Merrill Lynch.  *Id.* at 1165.  In the present case, Plaintiffs have alleged no such severe emotional distress.  Second, the district court had found that "the sales manager and office manager of the Denver office of Merrill Lynch approved and participated in that misconduct . . . ."  *Malandris v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 447 F. Supp. 543, 546 (D. Colo. 1977).  Plaintiffs have made no allegation of such direct involvement by Defendants in the present case.

Plaintiffs cite two cases for the proposition that abuse of a relationship or position of power may lead to the outrageousness of a defendant's conduct, but those cases are also inapposite.  In the Maryland case they cite, *Kentucky Fried Chicken Nat'l Mgmt. Co. v. Weathersby*, 607 A.2d 8 (Md. 1992), the court found that the relationship between the parties is a factor in determining whether conduct is outrageous but held that an employer's demotion of an employee with a vulnerable psychological state was not outrageous where the employer had no knowledge of that condition.  *Id.* at 14-17. Plaintiffs also cite a concurring opinion from a California case that posits recovery under intentional infliction of emotional distress, where the majority had found negligent infliction of emotional distress.  *See Marlene F. v. Affiliated Psychiatric Med. Clinic, Inc.*, 770 P.2d 278, 283-84 (Cal. 1992) (Arguelles, J., concurring).  The concurring judge argued for recovery for the mothers of children who had been molested by therapists. *Id.* at 288.  Accordingly, I find that Plaintiffs' outrageous conduct claim should be dismissed.

**CONCLUSION**

Based on the foregoing, it is hereby

ORDERED that the Motion of Defendants Contemporary Financial Solutions, Inc. and Mutual Service Corporation to Dismiss Plaintiffs' Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(6) [doc. #9, filed August 20, 2008] is **GRANTED in part and DENIED in part**. It is granted as to Plaintiffs' fifth, tenth, and thirteenth claims for relief and that portion of the fourth claim for relief for negligence *per se* arising out of violations of the Securities Act of 1933 and the Securities and Exchange Act of 1934, and denied in all other respects. Accordingly, it is

ORDERED that Plaintiffs' fifth, tenth, and thirteenth claims for relief, and that portion of the fourth claim for relief for negligence *per se* arising out of violations of the Securities Act of 1933 and the Securities and Exchange Act of 1934, are **DISMISSED WITH PREJUDICE**.

Dated: March 31, 2009

BY THE COURT:


s/ Wiley Y. Daniel
WILEY Y. DANIEL,
CHIEF UNITED STATES DISTRICT JUDGE