IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Wiley Y. Daniel**

Civil Action No. 08-cv-00675-WYD-BNB

ROBERT A. DOLIN; and
LISA DOLIN,

Plaintiffs,

v.

CONTEMPORARY FINANCIAL SOLUTIONS, INC.; and
MUTUAL SERVICE CORPORATION,

Defendants.

---

**ORDER**

---

THIS MATTER is before me on Defendants' Motion for Summary Judgment [ECF No. 68], filed October 16, 2009. In this action, Plaintiffs Robert and Lisa Dolin allege that Defendants Contemporary Financial Solutions, Inc. ("CFS") and Mutual Service Corporation ("MSC") are liable for their participation in and failure to protect Plaintiffs from non-party Robert Bryant's fraudulent sale of unregistered securities. Defendants move for summary judgment on each of Plaintiffs' claims pursuant to Fed. R. Civ. P. 56. I have considered Plaintiffs' Response to the motion for summary judgment [ECF No. 82], filed November 14, 2009, and Defendants' Reply [ECF No. 92], filed November 30, 2009. For the reasons stated below, Defendants' Motion for Summary Judgment is denied.

# I. BACKGROUND

## A. *Factual Background*

Voluminous facts have been asserted by both parties in connection with the summary judgment motion and briefing. I have viewed the evidence and drawn reasonable inferences in the light most favorable to the Plaintiffs, as I must for purposes of the summary judgment motion. *See Carolina Cas. Ins. Co. v. Yeates*, 533 F.3d 1202, 1204 (10th Cir. 2008). I will briefly summarize those facts which I deem pertinent to my ruling.

Non-party Robert Bryant was a registered securities representative with CFS from February 2003 to December 31, 2004. CFS is a wholly owned subsidiary of MSC. While Bryant was a registered representative of CFS, he marketed financial products to many of his clients, including the Plaintiffs Robert and Lisa Dolin ("the Dolins"). The Dolins did not have a formal account with CFS or MSC but were customers of Bryant, a registered CFS agent.

Beginning in 2003 Bryant represented to the Plaintiffs that National Consumer Mortgage, LLC's Private Money Division made "private money" or "hard money" loans in large amounts to financially strong, individual borrowers at higher-than-market interest rates. Bryant further represented to the Plaintiffs that National Consumer Mortgage's "private money investment" program depended on cash advances from investors to fund the hard money loans, in exchange for high rates of return. He represented that the promissory notes sold by MSC (hereinafter "the Note Contracts") were secured by a mortgage or deed of trust encumbering high quality real estate. Although Bryant was

prohibited by CFS and by industry rules and regulations from selling or offering for sale any security that was not approved for sale by CFS, Bryant sold the Note Contracts offered by National Consumer Mortgage. Sale of the Note Contracts was not authorized by CFS or MSC. Rather, CFS had strict rules against Bryant selling promissory note contracts. In March of 2004, the Dolins first purchased Note Contracts through Bryant.

On August 6, 2004, by letter to Dennis Kaminski at CFS, the Arkansas Securities Department notified CFS that it was investigating Bryant for violating securities laws by selling unregistered securities, including the Note Contracts from National Consumer Mortgage. (Pls.' Resp. Ex 11). The letter to Dennis Kaminski indicated that the Arkansas Securities Department had received a copy of flyer distributed by Bryant in Russellville, Arkansas which announced a presentation on "Private Money Investment Notes" to be held at a senior center. The Arkansas Securities Department enclosed the flyer–which included Bryant's CFS office address and phone number–with the letter they sent to CFS. The letter further indicated that the solicitation and sale of such investments by Bryant appeared to constitute an offer to sell a security and that such securities were not registered or exempted from the registration requirements in Arkansas. The letter additionally notified CFS that Bryant was under investigation by the Arkansas Securities Commission, and requested assurances from CFS that "the solicitation and collection of funds in National Consumer Mortgage by your registered representative has ceased." (Id.).

On August 19, 2004, Kari Turigliatto, MSC's Vice President and General Counsel

responded to the Arkansas Securities Department that she was investigating and inquiring about Bryant's activities relating to NCM in Arkansas. (Pls.' Resp. Ex. 12). Ms. Turigliatto indicated that she had contacted Bryant about the Note Contracts and demanded that he cease and desist from his sale of the Note Contracts (Id.). She further indicated that she would continue to investigate the sale of such Note Contracts by Bryant. CFS had the authority to supervise Bryant's sale of securities, and to discipline him for failure to comply with CFS's policies, including the authority to terminate Bryant for selling NCM Note Contracts.

The Dolins were not aware that the Arkansas Securities Department was investigating Bryant. Bryant did not cease his sale of the Note Contracts, and instead continued to sell NCM Note Contracts in 2004, 2005, and 2006.

On December 31, 2004, CFS filed a Form U-5 with the Central Registration Depository operated by the Financial Industry Regulatory Authority reporting the termination of Bryant's engagement with CFS. The U-5 form indicated that Bryant was not the "subject of an investigation or proceeding by a domestic or foreign governmental body or self-regulatory organization with jurisdiction over investment-related businesses." (Defs.' Mot. Summ. J. Ex. 1). The U-5 form further indicated that Bryant was not "under internal review for fraud or wrongful taking of property, or violating investment-related statutes, regulations, rules or industry standards of conduct." (Id.) The Form U-5 did not contain any information about Bryant's sale of Note Contracts, the internal investigation of Bryant by CFS, the investigation by the Arkansas Securities Department, or the fact that his disassociation from CFS occurred after such

investigations.

In November 2006, upon receipt of additional information about the sale of Note Contracts by Bryant, the Arkansas Securities Department issued a Cease and Desist Order to Bryant and National Consumer Mortgage ordering them to stop selling the Note Contracts. (Pls.' Resp. Ex 12). National Consumer Mortgage filed for bankruptcy in April 2006, revealing that the Note Contracts were not secured by real estate or any hard assets and that the program was a Ponzi scheme. After pleading guilty to securities fraud, Bryant has been incarcerated for a term of years and has filed for Chapter 7 Bankruptcy. The Dolins lost money they invested in 2005 and 2006 on Note Contracts sold by Bryant.

B. ***Procedural Background***

The Dolins filed their complaint against CFS and MSC on April 2, 2008 and they filed an Amended Complaint on July 31, 2008 [ECF No. 1, 6]. On August 20, 2008, CFS and MSC filed a Motion to Dismiss Plaintiffs' Amended Complaint [ECF No. 9]. On March 31, 2009 the Court issued an Order (hereinafter the March Order) granting in part and denying in part Defendants' Motion to Dismiss [ECF No. 30]. The Court dismissed the Dolin's fifth, tenth, and thirteenth claims for relief, and that portion of the fourth claim for negligence per se arising out of violations of the Securities Act of 1933 and the Securities and Exchange Act of 1934 [ECF No. 30]. After the March Order the following claims remain against the Defendants: (1) Negligent Hiring; (2) Negligent Supervision; (3) Negligent Failure to Monitor, Investigate & Report; (4) Negligence *Per Se*; (6) Vicarious Liability for Bryant's Fraudulent Misrepresentation; (7) Vicarious Liability for

Bryant's Concealments; (8) Vicarious Liability for Bryant's Negligent Misrepresentations; (9) Direct and Vicarious Liability for Fraud Under the Colorado Securities Act; (11) Direct and Vicarious Liability for Fraud Under Rule 10b-5; (12) Vicarious Liability for Bryant's Violations of the Colorado Organized Crime Control Act; (14) Vicarious Liability for Bryant's Violations of the Colorado Consumer Protection Act. Defendants seek summary judgment as to each of Plaintiffs' remaining claims.

**II. STANDARD OF REVIEW**

Under Federal Rule of Civil Procedure 56(c) summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248-50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Ross v. The Board of Regents of the University of New Mexico*, 599 F.3d 1114, 1116 (10th Cir. 2010). A disputed fact is "material" if under the relevant substantive law it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc*., 259 F.3d 1226, 1231-32 (10th Cir.2001). Only disputes over material facts can create a genuine issue for trial and preclude summary judgment. *Faustin v. City & County of Denver*, 423 F.3d 1192, 1198 (10th Cir.2005). An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir.1997).

When reviewing a motion for summary judgment, a court must "view the evidence and draw all reasonable inferences therefrom in the light most favorable to the

party opposing summary judgment." *Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000) (quotation omitted). In order to rebut a motion for summary judgment, an opposing party must present evidence permitted by Rule 56 setting forth specific facts that would be admissible at trial. Fed. R. Civ. P. 56(e)(2); *Adams v. Am. Guarantee and Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000).

## III. DISCUSSION

### A. ***First, Second, and Third Claims for Negligence***

As set forth in my March Order, a cause of action founded on negligence requires proof of the following elements: (1) the existence of a legal duty to the plaintiff; (2) the defendant breached that duty; (3) the plaintiff was injured; (4) the defendant's breach of duty caused the injury." *Raleigh v. Performance Plumbing and Heating, Inc.*, 130 P.3d 1011, 1015 (Colo. 2006). Defendants assert that summary judgment is appropriate on each of the Plaintiffs' first three claims, which are each negligence claims, because they did not owe a duty of care to the Plaintiffs and because there is no sufficient causal connection between Defendants' conduct and the resulting injury to the Plaintiffs. These elements of duty and causation are considered in turn.

#### 1. **Duty**

Defendants assert that they did not owe the Dolins a duty of care because the "Plaintiffs were strangers to Defendants as they never had any dealings or account with CFS." (Def.'s Mot. Summ J. 2). Defendants argue that because the Dolins never had a *formal* account with CFS, CFS cannot owe a fiduciary duty to the Dolins. (Id. at 2-4).

As I previously held in my March Order, the Court's finding in *Prymak v. Contemporary Financial Solutions, Inc.*, No. 07-cv-00103-EWN-KLM, 2007 WL 4250020 (D. Colo. Nov. 29, 2007)–a case involving the same ponzi scheme at issue here–did not depend on formal ownership of CFS accounts. I therefore agree with the Plaintiffs that in *Prymak,* "control" over an investment account contemplates practical control over a customer's investment assets, rather than any particular account formalities.

In *Rupert v. Clayton Brokerage Co*, 737 P2d. 1106, 1109 (Colo. 1987), the court held that "[w]here a customer relinquishes practical control over his brokerage account to a stockbroker, the broker owes wide-ranging fiduciary duties to the customer to manage the account in accordance with the customer's needs and objectives." (citing *Paine, Webber, Jackson & Curtis, Inc. v. Adams*, 718 P.2d 508, 515 (Colo.1986); *Henricksen v. Henricksen*, 640 F.2d 880 (7th Cir.1981). The court in *Rupert* did not predicate this finding on the existence of a formal account nor did the court hold that this is the *only* circumstance that may give rise to a fiduciary duty. To the contrary, the court held that the "existence and breach of a fiduciary duty in the context of a stockbroker/customer relationship is a question of fact to be determined by the jury or by the court sitting as the trier of fact." *Id*. (citing *Paine, Webber, Jackson & Curtis, Inc. v. Adams*, 718 P.2d 508, 518 (Colo. 1986).

The court in *Prymak* held that Bryant exercised functional control over brokerage accounts when he acted as the plaintiffs' investment advisor, solicited the plaintiffs to purchase NCM Notes and advised them to go into debt in order to buy additional notes. *Prymak*, 2007 WL 4250020, at *13. In the case at hand, the Dolins have submitted

evidence–sufficient to withstand summary judgement–that Bryant exercised such "functional control" over their assets. If Bryant had practical control over the Plaintiffs' assets, he owed the Plaintiffs a fiduciary duty. That duty then extended to the Defendants. Furthermore, the Defendants cannot eschew this duty by arguing that Bryant's conduct in selling NCM Note Contracts was not closely connected with his duties of as CFS registered agent. Indeed, Bryant's job as a CFS agent was to sell financial products, including securities, to clients such as the Dolins.

Accordingly, on the record before me, construing the facts in the light most favorable to the Dolins, I cannot say that the Defendants did not owe a fiduciary duty to the Dolins.

2. **Causation**

Defendants next argue that CFS could not have been the proximate cause of Plaintiffs' alleged damages. (Defs.' Mot. Summ. J. 11). An "act is the proximate cause of an injury if there would have been no injury but for the act and if the act was a substantial factor in bringing about the injury." *Berg v. United States*, 806 F.2d 978, 981 (10th Cir. 1986). "Where an investor's transactions would not have occurred but for the broker's failure to police the propriety of the transaction, causation may be established. *Rupert*, 737 P.2d at 1112. Furthermore, unless the facts are undisputed and reasonable minds can draw only one conclusion from them, "[p]roximate cause is a factual question." *Berg v. United States*, 806 F.2d 978, 981 (10th Cir. 1986). I find there are genuine issues of material fact as to whether the Dolins would have purchased any Note Contracts but for the Defendants hiring, supervision, and

monitoring of Mr. Bryant. Whether the Defendants' actions constituted a "substantial factor" in bringing about the injuries to the Plaintiffs is a question for the jury. Accordingly, Defendants' motion for summary judgment as to Claims one through Three is denied.

B. ***Fourth Claim for Negligence Per Se***

Plaintiffs' fourth claim for negligence *per se* alleges Plaintiffs suffered damages as a result of Defendants' violation of certain Arkansas and Colorado statutes. Section 23-42-110 of the Arkansas Securities Act makes its unlawful to file any misleading statement with the Arkansas Securities Commissioner, or his designees. Likewise, section 11-51-502 of the Colorado Securities Act makes it unlawful to submit a misleading statement to the Colorado Securities Commissioner. As previously set forth my March Order, [ECF No. 30], "negligence per se is simply negligence with the standard of care being set forth in a statute or ordinance." *Neiberger v. Hawkins*, 208 F.R.D. 301, 309 (D. Colo. 2002) (citing *Largo Corp. v. Crespin*, 727 P.2d 1098, 1107 (Colo. 1986)); *see also Wallman v. Kelley*, 976 P.2d 330, 333 (Colo. App. 1998). "The party seeking to recover under the doctrine of negligence per se must show not only that the defendant violated the statutory standard, but also that the violation was the proximate cause of the injuries sustained." *Largo Corp. v. Crespin,* 727 P.2d 1098, 1107-08 (Colo. 1986).

With respect to the Arkansas statute, Defendants first argue that the Dolins are not members of the class the statute is intended to protect because they are not Arkansas residents and because the transactions at issue did not occur in Arkansas.

Defendants further argue that the injuries suffered by the Dolins are not the kind the statute was intended to protect. (Def.'s Mot. Summ. J. 13-14). These arguments are without merit. As I have already stated in my March Order, I follow Judge Nottingham's reasoning in *Prymak* that the "reporting provisions of the Colorado and Arkansas securities acts are intended to protect *the investing public* from the perpetration of fraudulent securities schemes *such as the one alleged in the instant case*." (Order on Mot. to Dismiss, ECF No. 30) (emphasis added).

Defendants further argue that even if CFS had filed misleading information with the Arkansas or Colorado regulators, there is no evidence that this act proximately caused the Plaintiffs' injury. I disagree. Again, Plaintiffs have submitted evidence sufficient to raise genuine issues of material fact on this issue.

Last, Defendants contend that because CFS filed the U5 form for Bryant with the Central Registration Depository ("CRD"), which is operated by the Financial Industry Regulatory Authority ("FINRA"), rather than directly with Arkansas or Colorado regulators, that Defendants have not violated each state's statute. The Arkansas statute, however, makes it unlawful to file a false and misleading statement with the Arkansas Securities Commissioner or *its designee. See* Ark. Cod. Ann. § 23-42-110. And, the Arkansas Securities Commissioner has specifically designated the CRD to receive and store filings. *See* the Rules of the Arkansas Securities Commissioner, available at http://www.securities.arkasnas.gov. Similarly, under Colorado law, notification by a broker-dealer that a licensed sales representative is no longer employed by that broker-dealer may be made by filing the information with the CRD.

C.R.S. § 11-51-406(5)(a). Accordingly, the Defendants' motion for summary judgment on Claim Four is denied.

C. ***Sixth, Seventh, & Eighth Claims for Vicarious Liability For Fraudulent Misrepresentation, Fraudulent Concealment, and Negligent Misrepresentation***

Defendants argue that they cannot be held vicariously liable for the acts of Bryant because he was an independent contractor, rather than an employee of CFS. Defendants therefore assert that liability only attaches if Plaintiffs can establish that Bryant had apparent authority to sell Note Contracts on behalf of CFS. (Def.'s Motion Summ. J. 15-16).

Generally, a party is not liable for the torts of its independent contractors. *Powell v. City and County of Denver, Colo.* 973 F.Supp. 1198, 1202 (D.Colo.1997). The determination of whether an individual is an employee or an independent contractor is a question of fact. *Am. Exp. Fin. Advisors, Inc. v. Topel*, 38 F.Supp.2d 1233, 1240-41 (D.Colo.,1999) (citing *Hockett v. Sun Co., Inc.*, 109 F.3d 1515, 1525-26 (10th Cir.1997)). "In making this determination under the general common law of agency, courts evaluate all factors relevant to the hiring party's right to control the manner and means by which the product is accomplished." *Id.* These factors include

> (a) the source of the instrumentalities and tools for the person doing the work; (b) the location of the work; (c) duration of the work relationship; (d) the hiring party's right to assign additional duties to the hired party; (e) whether the work is a part of the regular business of the hiring party; (f) whether the hiring party is or is not in business; and (g) the intent of the parties."

*Id*.

Viewing the evidence in the light most favorable to Plaintiffs, a reasonable jury

could conclude that CFS exercised enough control over Bryant's work that he was effectively a servant and not an independent contractor. The Defendants object to the testimony of Plaintiffs' expert that Bryant was an "employee" of CFS, and not his agent. (Defs.' Reply 18, ¶ 2). Plaintiff's expert, however, may opine about the relationships of registered representatives in the securities field without asserting a legal opinion about the particular relationship between CFS and Bryant. More importantly, this is not the only evidence of CFS's control over Bryant. Mr. Bryant could only sell securities through CFS and was required to follow the CFS Compliance Procedures Manual. Mr. Bryant worked in a one-man office under the CFS name. Pursuant to CFS Compliance Procedures, he was required to maintain visible CFS signage in that office, which he did maintain. And, since Bryant also sold business cards related to his insurance business, he was required to have a notice on his business cards that "Securities offered through Contemporary Financial Services, Inc., Member NASD and SIPC." Drawing all reasonable inferences in favor of Plaintiff, summary judgment is not appropriate. I therefore need not consider whether the Defendants may also be held liable under the doctrine of apparent or ostensible authority.

D. ***Ninth and Eleventh Claims for Vicarious Liability for Securities Fraud***

Plaintiffs Ninth and Eleventh claims assert secondary liability against the Defendants founded upon allegations that CFS was a "control person" vis-a-vis Bryant, within the meaning of § 20(a) of the Securities Exchange Act of 1934 and its Colorado counterpart. 15 U.S.C. § 78t(a); C.R.S. § 11-51-604(5)(b). Under these provisions, liability for a securities law violation may be imposed not only on the person who

actually commits the violation, but also on an entity or an individual who controls the violator. *Id*. In order to establish a prima facie case of control person liability, Plaintiffs must "present evidence from which a reasonable fact finder could conclude that (a) a primary violation of the securities laws occurred; and (b) the defendant controlled the person or entity committing the primary violation." *Stat-Tech,,* 981 F.Supp. at 1337 (citing *First Interstate Bank of Denver v. Pring*, 969 F.2d 891, 896 (10th Cir.1992), rev'd on other grounds sub nom., *Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994).

Defendants do not argue Bryant did not violate the Federal or Colorado act. Nor do they argue that they are not control persons for purposes of the acts. Rather, relying on *Stat-Tech Liquidating Trust v. Fenster*, 981 F. Supp. 1325 (D. Colo. 1997), Defendants argue that even if they are control persons, they are still not liable for Bryant's off-book transactions.

The court in *Stat-Tech* recognized a holding from the Ninth Circuit, *Hauser v. Farrell*, 14 F.3d 1338 (9th Cir.1994), wherein that court granted summary judgment in favor of a broker-dealer where the evidence was undisputed as to four points:

> (a) the registered representatives did not make use of the broker-dealer's access to the securities markets to promote or effectuate the sales of the partnership interests; (b) the broker-dealer had no knowledge of the complained-of transactions; (c) the partnership interests being sold by the registered representatives were unrelated to any securities sold or offered by the broker-dealer; (d) the plaintiffs did not rely on the registered representatives' relationship with the broker-dealer in making their decision to invest in the partnership.

*Stat-Tech*, 981 F.Supp. at 1338. Under those circumstances, the Court in *Hauser* granted summary judgment to the broker-dealer. Here, however, Defendants have not

demonstrated that the facts are undisputed as to each of the four factors set forth in *Hauser* and *Stat-Tech.* Plaintiffs have presented evidence sufficient to create genuine issues of material fact as to factors (b) and (d). As such, summary judgment as to Plaintiffs Ninth and Eleventh Claims is denied.

E. ***Claim Twelve - Vicarious Liability Under COCCA***

Plaintiffs' twelfth claim contends that CFS is vicariously liable for Bryant's alleged violations of the Colorado Organized Crime Control Act ("COCCA") (C.R.S. § 18-17-104(1)-(4). COCCA imposes penalties against those who profit from a "pattern of racketeering." Each of the four activities prohibited by COCCA consists of a different method of using a "pattern of racketeering" to influence an "enterprise." *New Crawford Valley, Ltd. v. Benedict,* 877 P.2d 1363, 1370 (Colo. App. 1993). Plaintiffs assert that Bryant engaged in all four activities prohibited by the COCCA.

As discussed above with respect to Plaintiffs' Sixth, Seventh, and Eighth claims, Plaintiffs have raised genuine issues of material fact as to CFS's vicarious liability for Bryant's actions. The Defendants only other argument is that Plaintiffs have not presented sufficient evidence of an underlying violation of the COCCA by Bryant. I disagree. Drawing all inferences in favor of the Plaintiffs, Plaintiffs have presented evidence that Bryant knowingly engaged in fraudulent conduct (the Ponzi scheme); that he used the proceeds to invest in real estate and to further invest in the Ponzi scheme; that he knowingly participated in the operation of the National Mortgage Company; and that there was concerted action between Bryant and other members of the National Mortgage Company. As such, Defendants' motion for summary judgement is denied as

to claim twelve.

F. ***Claim Fourteen - Vicarious Liability Under the CCPA***

In their Fourteenth claim, the Dolins assert that Defendants are vicariously liable for Bryant's violations of the Colorado Consumer Protection Act under the alternatives theories of actual or apparent authority and/or respondeat superior. Defendants argue that regardless of whether Bryant committed violations of the CCPA, they cannot be held liable because Plaintiffs cannot establish the elements necessary to apply the ostensible authority doctrine. I find, however, that as set forth above, a reasonable jury could find that Bryant's relationship with CFS was more akin to an employee than an independent contractor. Therefore summary judgement is not appropriate and I need not consider Plaintiffs alternative theory of apparent authority in this order.

G. ***Liability of MSC - Alter Ego Theory***

Finally, Defendants argue that all claims should be dismissed against Defendant MSC because CFS is not the alter ego of MSC nor an agent of MSC. Plaintiffs argue that MSC used CFS as a mere instrumentality and that therefore it is appropriate to pierce the corporate veil.

In *Micciche v. Billings*, 727 P.2d 367 (Colo.1986), the Colorado Supreme Court discussed the doctrine of corporate veil piercing under Colorado law:

> Generally, a corporation is treated as a legal entity separate from its shareholders, thereby permitting shareholders to commit limited capital to the corporation with the assurance that they will have no personal liability for the corporation's debts. Krendl & Krendl, Piercing the Corporate Veil: Focusing the Inquiry, 55 Den. L.J. 1 (1978). When, however, the corporate structure is used so improperly that the continued recognition of the corporation as a separate legal entity would be unfair, the corporate entity may be disregarded and corporate principals held liable for the

> corporation's actions. I*d*. at 2. Thus, if it is shown that shareholders use the corporate entity as a mere instrumentality for the transaction of their own affairs without regard to separate and independent corporate existence, or for the purpose of defeating or evading important legislative policy, or in order to perpetuate a fraud or wrong on another, equity will permit the corporate form to be disregarded and will hold the shareholders personally responsible for the corporation's improper actions.

*Micciche*, 727 P.2d at 372-73. In determining whether a subsidiary should be regarded as the mere instrumentality of its parent, the Tenth Circuit has found that the following factors should be taken into consideration, although not all of the factors must be established:

> (1) the parent corporation owns all or a majority of the capital stock of the subsidiary; (2) the parent and subsidiary corporations have common directors or officers; (3) the parent corporation finances the subsidiary; (4) the parent corporation subscribes to all the capital stock of the subsidiary or otherwise causes its incorporation; (5) the subsidiary has grossly inadequate capital; (6) the parent corporation pays the salaries or expenses or losses of the subsidiary; (7) the subsidiary has substantially no business except with the parent corporation or no assets except those conveyed to it by the parent corporation; (8) in the papers of the parent corporation, and in the statements of its officers, 'the subsidiary' is referred to as such or as a department or division; (9) the directors or executives of the subsidiary do not act independently in the interest of the subsidiary but take direction from the parent corporation; (10) the formal legal requirements of the subsidiary as a separate and independent corporation are not observed.

*Skidmore, Owings & Merrill v. Canada Life Assurance Co.*, 907 F.2d 1026, 1027 (10th Cir.1990), quoted with approval in *Great Neck Plaza, L.P. v. Le Peep Restaurants, LLC*, 37 P.3d 485, 490 (Colo. App. 2001).

Construing the evidence in light most favorable to the Plaintiffs, I agree that Plaintiffs have presented enough evidence as to factors 1-4, 6, and 9, and thus enough evidence to preclude summary judgment. It is undisputed that MSC incorporated CFS

in 2002 as a wholly owned subsidiary. Plaintiffs have additionally presented sufficient evidence of common, though not identical, directors and officers. At least some of these officers and directors were not paid by CFS, but were paid by MSC. The parties dispute the extent to which CFS's executives acted independently in the interest of CFS or rather, took direction from MSC. Plaintiffs did, however, present testimony that the duties of CFS and MSC's officers and directors blurred together. (*See e.g.* Michael Poston depo. at 66, lines 11-18). For example, when asked if he was ever an officer of CFS, former MSC officer John Poff testified as follows: "I'm sure I was. I don't recall what position, but I must have been an officer. . . because it was a wholly-owned subsidiary of Mutual Service Corporation, and I believe it had joint officers with the two companies. There were mutual officers of both companies." (Poff depo. at 5, lines 14-21, Pls.' Ex. 19). John Dixon's deposition testimony likewise evidences commonality between officers and directors, as well as uncertainty about his role in that commonality. (Dixon Depo at 36 lines 11-15 "Q: Do you know if it had common or shared officers and/or directors? A: I believe there were some officers and directors the same. *I think I was in both companies*. I assume John was."). In addition, CFS operated from two cubicles within MSC and MSC conducted several business functions on behalf of CFS. Because several factors are present that would support piercing the corporate veil and because this is a factual determination, I conclude that summary judgment on this issue is not appropriate. Because I find there are genuine issues regarding whether CFS was a mere instrumentality of MSC, I need not consider Plaintiffs' alternative agency theory.

## IV. CONCLUSION

Based on the foregoing, it is hereby

ORDERED that Defendants' Motion for Summary Judgment is **DENIED.**

Dated: December 3, 2010

BY THE COURT:
s/ Wiley Y. Daniel
Wiley Y. Daniel
Chief United States District Judge